UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA PULLMAN, *individually and behalf of all other persons similarly situated*, *et al.*,

Plaintiffs,

-v-

DANA COLLINS, *individually and in her representative capacity, et al.*,

Defendants.

No. 24-CV-1383 (KMK)

OPINION AND ORDER

Appearances:

Brooke D. Youngwirth, Esq.
Youngwirth Law PLLC
Poughkeepsie, NY
*Counsel for Plaintiffs*

Howard T. Schragin, Esq.
Sapir Schragin, PLLC
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiffs Alexandra Pullman ("Pullman"), Arianna Milanese ("Milanese"), Jaclyn Knanishu ("Knanishu"), and Melissa Dinsmore ("Dinsmore," and, together with Pullman, Milanese, and Knanishu, "Named Plaintiffs"), individually and on behalf of all other persons similarly situated, bring this Action against their former employers, Dana Collins and Kevin Collins, (the "Individual Defendants"), Roonies, Inc. d/b/a/ Publick House 23 ("Roonies"), and Tweegs, Inc. d/b/a/ Melzingah Tap House ("Tweegs," and collectively with the Individual Defendants and Roonies, "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the New York Labor Law ("NYLL"), §§ 190 *et seq.* and 650

*et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 296 *et seq.*, and state common law. (*See* Second Am. Compl. ("SAC") ¶¶ 260–378 (Dkt. No. 40).)[1] Defendants have moved to partially dismiss Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See* Not. of Mot. (Dkt. No. 41).) For the reasons that follow, Defendants' Motion is denied in part and granted in part.

## I. Background

### A. Factual Background

Unless otherwise stated, the following facts are drawn from the Second Amended Complaint. The facts alleged therein are assumed true for the purpose of resolving the instant Motion. *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

#### 1. The Parties

Roonies, a domestic business corporation, owns and operates Publick House 23, a restaurant and bar located in Pleasant Valley, NY. (SAC ¶¶ 2–3.) Tweegs, a domestic business corporation, owns and operates Melzingah Tap House, a restaurant and bar located in Beacon, NY. (*Id.* ¶¶ 4–5.) The Individual Defendants, the co-owners and managing members of Roonies and Tweegs, maintain management authority over employees at both businesses. (*Id.* ¶¶ 13–14.) In their supervisory role, Individual Defendants have "the authority to modify the terms and conditions" of their employees' employment, "as well as control and modify Roonies' and Tweegs' pay practices," including the amount paid to their employees. (*Id.*)

Defendants employ over thirty employees. (*Id.* ¶ 15.) Although they are separate restaurants, Publick House 23 and Melzingah Tap House operate as a joint employer and share

[1] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

"staffing and resources," occasionally dispatching servers or bartenders at one location to work at the other "for a catered party or other purpose." (*Id.* ¶ 16.) Both establishments "employed the same policies and procedures, as well as the same accountant and payroll software," and Defendants used funds from each establishment interchangeably. (*See id.* ¶ 17.)

During the relevant time period, Plaintiffs were employed by Defendants as servers and bartenders at either (or both) Publick House 23 and Melzingah Tap House. (*Id.* ¶¶ 7–11.)

2. Defendants' Pay Practices

Plaintiffs allege that, over the course of their employment, Defendants engaged in pervasive and consistent misconduct regarding Plaintiffs' pay. Specifically, Plaintiffs allege, inter alia, that: (1) they were not paid overtime for any hours worked over forty in a week and/or spread of hours pay for hours worked over ten in a day, (*id.* ¶¶ 64, 110, 125, 143, 147); (2) through the entirety of their employment, they never received any notice from Defendants "pertaining to [their] hiring rate[s], tip arrangement, or salar[ies]," (*id.* ¶¶ 50, 87, 125, 130, 148); (3) Dana Collins would frequently instruct the employees to sign in for their shifts under Dana Collins' account at both establishments, rather than as themselves, "which made keeping track of [their] hours difficult," (*id.* ¶¶ 59, 106, 134, 151); (4) they were paid "off the books" for a portion of their employment and not provided with W-2s, (*id.* ¶¶ 48, 88, 136, 141); (5) Plaintiffs were often paid in cash from the register each night, and if the cash register was inadequate, Defendants promised to pay the shortfall the following week but rarely did, (*id.* ¶¶ 102, 105, 123, 149); (6) when they were paid on the books, Plaintiffs' paychecks, which Dana Collins was responsible for accurately editing, did not accurately reflect their recorded hours or credit card tips, (*id.* ¶¶ 47, 62, 93, 99, 101, 103, 145, 153); (7) Defendants would routinely edit Plaintiffs' time to make it appear as if Plaintiffs had not worked more than ten hours a day or forty hours in

one week, (*id.* ¶¶ 64, 74, 107, 146–47); (8) Plaintiffs did not always receive paychecks or pay stubs, making it difficult to track how much they earned, (*id.* ¶¶ 68, 109, 131); (9) Defendants implemented inconsistent tip policies, resulting in inaccurate distribution of tips, and would occasionally instruct Plaintiffs to "claim zero in tips" at the end of the night and promise to "input the correct amount" in tips in their next paycheck, (*id.* ¶¶ 66, 72, 105, 124, 131, 136); (10) Plaintiffs were required to train other employees but were not compensated for that training time, (*id.* ¶¶ 78, 84, 98, 137); and (11) Plaintiffs were not provided with meal or rest breaks at either restaurant, (*id.* ¶¶ 84, 111, 137, 156).

Moreover, Plaintiffs allege that they had inconsistent work schedules, frequently picked up shifts outside their "regularly" scheduled hours, and that all those inconsistencies—in addition to the ones enumerated above—made it difficult to track the extent to which they were denied proper compensation. (*See, e.g.*, *id.* ¶¶ 46, 56, 88, 127–28, 132, 141.) Although Plaintiffs frequently complained about these issues, and although Defendants were aware of the FLSA and the NYLL's overtime and wage requirements, Defendants refused to change their policies. (*See, e.g.*, *id.* ¶¶ 194–98, 201–03, 205, 208, 210, 222, 227.)

Plaintiffs assert that the above allegations apply to all members of the putative FLSA collective and the putative New York class. (*See id.* ¶¶ 208–59.) Allegations specific to each Named Plaintiff are detailed below.

3. Pullman

a. Working Schedule and Wages

Pullman was employed by Defendants from July or August 2014 until March 2022. (*Id.* ¶¶ 42–43.) Pullman worked chiefly at Publick House 23, apart from a six-month stint at Melzingah Tap House following its opening in May 2018. (*Id.* ¶ 42.)

From 2014 to 2018, Pullman's "regular" shifts at Publick House 23 were as follows: Thursday from 6:00 PM to close—which varied between 2:00 AM and 4:00 AM—Fridays 6:00 PM to close, "some Mondays," and Saturdays 10:30 AM to 6:00 PM. (*Id.* ¶ 45.) Around March of 2018, Pullman began working frequently at Melzingah Tap House before and after its official opening, helping to set up the establishment. (*Id.* ¶ 48.) Her "regular" shifts at Melzingah were Tuesday evenings, Friday mornings, and Saturday mornings, but "in reality," she alternated between morning and evening shifts and "picked up numerous shifts including Sundays." (*Id.* ¶ 46.)

Although Pullman's shifts were typically ten hours, they varied and occasionally exceeded twelve hours a shift, for a total of forty-eighty hours worked in a week. (*Id.* ¶ 44.) Moreover, because "she was often called in to work unscheduled shifts," Pullman worked approximately forty-eight hours a week at Publick House 23 for at least three weeks per month and worked approximately five to ten hours over overtime at Melzingah at least one week per month. (*Id.* ¶¶ 55–56.) Pullman also alleges that while pulling double duty at both establishments, she "worked approximately fifty[] to sixty-five[] hours per week combined at both restaurants." (*Id.* ¶ 55.) When she returned to work only at Publick House, she continued to work approximately forty-eight hours per week. (*Id.* ¶ 57.)

From approximately 2014 to 2019, Pullman was paid "off the books" at Publick House 23 at the rate of $30 per shift and $60 per double shift. (*Id.* ¶ 44.) That pay rate stayed the same "irrespective of the number of the hours worked in any given shift." (*Id.*) While working to set up Melzingah Tap House in 2018, Pullman was paid off the books a flat rate of $640 per week (or $16 per hour) for a forty-hour week, despite regularly working forty-eight to sixty hours. (*Id.* ¶ 48.) Pullman does not allege the rate she was paid after 2019. (*See generally id.*)

During her employment, Pullman was not compensated at an overtime rate for any hours worked over forty hours, often did not receive hourly pay, and frequently did not receive her earned tips. (*Id.* ¶¶ 48, 60–63, 66, 70.) By example, Pullman points to a specific week in March 2022 where she allegedly worked forty-seven hours but was only paid for forty hours. (*Id.* ¶ 61.) In total, Pullman estimates that she was underpaid approximately eight to ten hours of overtime per week since 2014. (*Id.* ¶ 75.) Further, she estimates that she is owed approximately $1,200 per week in unpaid tips from 2014 to present from Publick House, and $500 to $2,500 per shift in unpaid tips from Melzingah. (*Id.* ¶¶ 75–76.) Pullman ultimately resigned from her employment in March 2022, (*id.* ¶ 8), largely due to "[t]he imprecision of [Defendants'] financial tracking and a lack of transparency in remuneration," (*id.* ¶ 66).

b. <u>Pregnancy</u>

While employed by Defendants, Pullman became pregnant and "timely" informed Defendants of her pregnancy. (*Id.* ¶ 79, 82.) Pullman stopped working in July 2021 and gave birth in August 2021. (*Id.* ¶ 79.) Defendants never provided Pullman with "written notice of the right to be free from discrimination in relation to pregnancy," and never informed Pullman that she was entitled to New York Paid Family Leave ("NYPFL"), "despite inquiry." (*Id.* ¶¶ 80, 81.) Pullman was not paid while she was out of work after giving birth to her child, "despite the fact that, upon information and belief, funds were deducted from her pay" for NYPFL. (*Id.* ¶ 81.) Pullman returned to work after a month and a half after her child's birth "because she could not continue to be out of work and not paid." (*Id.* ¶ 79.)

4. Milanese

a. Work Schedule and Wages

Milanese was employed by Defendants as a server at Publick House 23 from approximately January 2013 to January 2022. (*Id.* ¶ 87.) Until 2019, Milanese was paid "off the books" at the rate of $30 per shift and $60 per double shift "irrespective of the number of hours worked in a shift, which was typically ten." (*Id.* ¶ 88.) In 2019, Milanese began to receive hourly pay but was not accurately paid for the hours worked. (*Id.* ¶ 93.) Milanese does not allege the rate she was paid after 2019. (*See generally id.*)

Milanese worked primarily evening shifts, starting with at least three shifts per week and increasing to double-shift days or adding days when covering for colleagues. (*Id.* ¶ 89.) Her regular shifts were supposed to be Monday and Wednesday nights from 6:00 PM to closing, and Saturdays from 10:30 AM to 6:00 PM, but these shifts frequently changed. (*Id.* ¶ 88.) Milanese would often work over ten-hour days on each weekend day. (*Id.* ¶ 90.) On Fridays, Milanese would typically work from 10:00 AM until 2:00 AM the following day, and then work Saturdays from 10:30 AM until 7:00 PM, or until 4:00 AM if she took on a double shift. (*Id.* ¶ 91.) Milanese estimates that she during the "entirety of her employment," she worked approximately forty-two to fifty hours per week. (*Id.* ¶ 88–89, 91.) Milanese never received overtime pay during this time. (*Id.* ¶¶ 91, 96.)

Milanese alleges that she notified Dana Collins about her tip and pay discrepancies—as well as the fact that she often did not receive a paycheck or pay stub—"on numerous occasions without avail." (*Id.* ¶ 109.) Milanese also alleges that in March 2017, after working over fifteen hours and not receiving proper compensation, she complained to Dana Collins about not

receiving overtime or spread of hours pay. (*Id.* ¶ 92.) Collins informed Milanese that "she had made enough money and the underpayment did not need to be corrected." (*Id.*)[2]

b. Pregnancies and Termination

Milanese became pregnant during the course of her employment with Defendants, having children in November 2017, April 2019, and March 2021. (*Id.* ¶¶ 114, 116.) Milanese informed her direct supervisor that she was pregnant in a timely manner. (*Id.* ¶117.) Defendants never provided Milanese with "written notice of the right to be free from discrimination in relation to pregnancy," and never informed Milanese that she was entitled to NYPFL, "despite inquiry." (*Id.* ¶¶ 113, 115.) Milanese was not paid while she was out of work after giving birth to her child, "despite the fact that, upon information and belief, funds were deducted from her pay" for NYPFL. (*Id.* ¶ 115.) In January 2022, six months after returning to work after her pregnancy, Milanese was terminated. (*Id.* ¶¶ 10, 118.)[3] Defendants informed Milanese that "they had wanted to terminate her when she was pregnant because her pregnancy caused her to be unable to come into work." (*Id.* ¶ 118.)

[2] Plaintiffs also allege that Dinsmore is in possession of a text message "recording a reported pay discrepancy with Milanese's paycheck dated December 23, 2020 wherein Milanese noted that her paycheck was short by $200.00." (*Id.* ¶ 97.) However, Plaintiffs do not clarify who this text message was from—i.e., whether Milanese also reported the shortfall to Defendants or only noted it to Dinsmore.

[3] Milanese does not specify whether these allegations pertain only to a specific one of her pregnancies or all three of them. (*See id.* ¶¶ 114–19.) Given that Milanese alleges she was terminated on approximately January 15, 2022, the Court assumes that the allegations discussed here pertain to the pregnancy that resulted in her giving birth in March 2021. (*See id.* ¶¶ 10, 118.)

Milanese also alleges that the termination occurred "immediately after she had also complained of pay violations" and that Defendants terminated her because of those complaints. (*Id.* ¶¶ 110, 118.)[4]

5. Knanishu

Knanishu was employed by Defendants as a server at Publick House 23 from approximately September 2016 through July 2021, and then as a bartender through 2022. (*Id.* ¶ 121.) Knanishu alternated between morning shifts (typically 9:00 AM until 6:00 PM) and evening shifts (6:00 PM until closing between 2:00 AM and 4:00 AM), averaging about forty-five hours per week. (*Id.* ¶ 122.) Beginning in 2018, Knanishu also began working at Melzingah Tap House, taking shifts that typically started as "early as 9:00 AM until 3:00 PM, reopening from 4:00 PM to as late as 10:00 PM," and occasionally going until midnight or later, for approximately forty-five hours per week. (*Id.* ¶¶ 127, 129.) Knanishu's "regularly scheduled shift[s]" were never consistent, as they "varied based on the needs of Defendants, where she was scheduled, and how late the establishments stayed open." (*Id.* ¶ 128.) After Melzingah Tap House opened, Knanishu typically only worked one or two shifts at Publick House, later adding a few days a week at Melzingah, but would sometimes be sent from one restaurant to another on the same day, based on Defendants' needs. (*Id.* ¶¶ 127, 129.) Eventually, Knanishu's schedule evolved to more "significantly more" at both establishments, totaling approximately fifty-six hours per week "when requested to work doubles or at both restaurants in one day." (*Id.* ¶ 133.)

[4] Milanese alleges that she was "out of work" during the COVID-19 lockdown from March 14, 2020 until she "resumed her duties in May 2024." (*Id.* ¶ 108.) However, Milanese also alleges that she worked in December 2020 and in 2021 and moreover, was terminated in January 2022, six months after returning to work from taking leave after giving birth in March 2021. (*See id.* ¶¶ 10, 97, 101, 114, 118.) Therefore, the Court assumes that "May 2024" is a typo and that Milanese returned to work at some unknown point in 2020.

At Publick House 23, Knanishu was paid "off the books" at the rate of $6 per hour until 2019. (*Id.* ¶ 123.) Beginning in 2019, Knanishu was paid at a flat rate of $200 to $300 per shift, "which varied at the discretion of the Defendants." (*Id.*) At Melzingah Tap House, Knanishu received a flat $200 to $300 "for opening activities." (*Id.* ¶ 126.) Because Knanishu's actual earnings were "seldom accurate or complete," and because Defendants' inconsistent pay and tip policies ensured Knanishu was never sure "how much she would make in a given day," she eventually resigned from her employment in 2022. (*Id.* ¶ 131; *see also id.* ¶ 11.)

Knanishu estimates that she earned $500 to $1,500 per week in tips that she never received from Defendants. (*Id.* ¶ 131.) She further estimates that—assuming she only worked forty-five hours a week, rather than fifty-six—she is owed approximately $7,000 to $8,000 a year in overtime. (*Id.* ¶ 133.)

6. Dinsmore

a. Work Schedule and Wages

Dinsmore was employed by Defendants as a sever and bartender at Publick House from approximately April 2018 to August 14, 2024. (*Id.* ¶ 9.) Dinsmore was originally scheduled to work Mondays from 11:00 AM to 6:00 PM, Thursdays from 11:00 AM to 6:00 PM, plus "double shifts when needed" every few weeks. (*Id.* ¶ 141.) "A few years later," Dinsmore began working Monday from 11:00 AM until close, Wednesday from 11:00 AM to 6:00 PM, Thursday from 11:00 AM to 6:00 PM, and Saturdays 11:00 AM to 6:00 PM, and would cover shifts of other employees, totaling approximately forty-eight hours worked a week. (*Id.*) Moreover, approximately twice a week, Dinsmore would work more than ten hours per day. (*Id.* ¶ 147.)

From 2018 until 2019, Dinsmore was paid "off the books [at] $40 per shift[,] irrespective of hours worked in that shift." (*Id.* ¶ 141.) At an undefined date, Dinsmore was promoted to a

managerial position "with a promised wage of $20 per hour but was only compensated at $15 per hour." (*Id.* ¶ 142.)

During her employment, Dinsmore was not compensated at an overtime rate for any hours worked over forty hours, did not receive spread of hours pay for hours worked over ten in a day, often did not receive hourly pay, and frequently did not receive her earned tips. (*Id.* ¶ 143.) By example, Dinsmore points to twelve specific weeks from 2021 to 2023 where she worked over forty hours but was not paid for overtime. (*See id.* ¶ 146.)

b. <u>Complaints and Retaliation</u>

In January 2024, Dinsmore complained about Defendants' illegal pay practices to a colleague, describing other employees that assisted in these practices as Dana Collins' "flying monkeys." (*Id.* ¶ 154.) When Dana Collins learned of this comment and complaint, she demoted Dinsmore, took away Dinsmore's bartending duties, reduced her pay from $15 an hour to $10 an hour, and began to take a "tip credit" of $5 an hour off of Dinsmore's pay. (*Id.* ¶ 155.)

When Dinsmore learned that the other named Plaintiffs were going to file the instant Action, Dinsmore provided them with a text message from Dana Collins to Dinsmore, wherein Dana Collins stated she was planning on changing Dinsmore's hours from more than forty in one week to less than forty. (*Id.* ¶ 157.) On August 9, 2024, Plaintiffs' counsel emailed Defendants' counsel with a proposed amended complaint, which contained the contents of said text message. (*Id.* ¶ 158.) A few days later, Dana Collins pulled Dinsmore aside and informed her, "I know that you gave [Pullman] the text message saying that I moved hours around and I know that you didn't do it to hurt me, but it is being used against me in court. Do you have anything that I can use against them in court?" (*Id.* ¶ 159.) Dinsmore informed her she did not. (*Id.* ¶ 160.) On August 14, 2024, the Individual Defendants called Dinsmore into their office and informed her

she was being terminated, as "their lawyer told [Dana Collins] that she could not have [Dinsmore] there any longer for legal reasons." (*Id.* ¶ 161.) The Individual Defendants also informed Dinsmore she needed to sign a non-compete agreement releasing any claims she might have, told her that if she did not sign, they would "report her to the police" for allegedly "padding her tips," and offered her $3,000 if she would sign. (*Id.* ¶¶ 162, 164.) Dinsmore—who disputes the tip-padding allegations, (*see id.* ¶¶ 163, 166–67)—refused to sign the release and left following her termination, (*id.* ¶ 164).

Shortly thereafter, Dinsmore joined the instant lawsuit. (*See id.* ¶¶ 169–70.) On September 12, 2024, less than two hours after Plaintiffs' counsel informed Defendants' counsel that Dinsmore had joined the litigation, Dana Collins "made a false report" to the New York State Police, alleging that Dinsmore had unlawfully altered tip amounts on receipts and "stolen approximately $1,600 from many of [Defendants'] customers." (*Id.* ¶ 171.) Dinsmore was arrested by the New York State Police on September 20, 2024, on the basis of "false statements made by Defendants . . . in retaliation for [Dinsmore] joining this lawsuit." (*Id.* ¶¶ 179, 182.)

7. Sexual Harassment

Plaintiffs also allege that they were subject to gender discrimination and sexual harassment while employed by Defendants. (*Id.* ¶ 186.) Specifically, Plaintiffs allege they "were subjected to inappropriate sexual commentary on an almost near daily basis from the chefs" at Publick House, who would "grab" at Plaintiffs and other female servers, "comment on their bodies, ask if they liked giving oral sex, and ask what their favorite position was." (*Id.*) Despite complaints from Pullman, Milanese, and Dinsmore, "the harassment was permitted to continue," and Defendants did not require any employees "to undergo sexual harassment training." (*Id.*)

Further, on one occasion, a customer harassed Dinsmore "by video-taping underneath her skirt." (*Id.* ¶ 184.) Dinsmore complained about this incident to Dana Collins, as well as complaining about it on social media. (*Id.*) Dana Collins did not do anything in response except tell Dinsmore "not to drag the pub" into the matter and reprimand her for complaining about a customer. (*Id.* ¶ 185.)

Additionally, on or about November 2024, Dinsmore complained to Dana Collins that members of the kitchen staff had "inappropriately touched the female staff" and made several inappropriate comments, including a chef "shouting at Dinsmore to give him oral sex." (*Id.* ¶ 187.) Collins said "she would not do anything about the chef's behavior because it was not as easy to replace a chef as it was a bartender or server." (*Id.*)

B. Procedural History

Plaintiffs, suing on behalf of themselves, a putative FLSA collective, and a putative New York class, initiated the instant Action on February 23, 2024. (*See* Dkt.) After the Parties' Proposed Case Management Plan was adopted by the Court, (*see* Dkt. Nos. 21–22; Dkt. (minute entry for Sept. 19, 2024)), the Parties commenced discovery. On September 25, 2024, Plaintiffs filed a First Amended Complaint. (*See* Dkt. No. 26.) After requesting and receiving leave to amend, (*see* Dkt. Nos. 28–35), Plaintiffs filed a Second Amended Complaint on December 27, 2024, (*see* Dkt. No. 40).

After the Parties commended discovery on certain claims, (*see* Dkt. No. 22), Defendants filed a Partial Motion to Dismiss the Second Amended Complaint on January 29, 2025, (*see* Not of Mot.; Defs' Mem. in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 42.)). Plaintiffs filed their

Opposition on March 3, 2025. (*See* Pls' Opp. to Mot. ("Pls' Opp.") (Dkt. No. 48).) On March 24, 2024, Defendants filed a Reply. (*See* Reply in Supp. of Mot. ("Reply") (Dkt. No. 52).)[5]

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the

[5] Separately, Defendants sought to stay discovery pending resolution of their Motion to Dismiss. (*See.* Dkt. Nos. 43, 46.) Plaintiffs opposed the request. (*See* Dkt. No. 45.) On April 3, 2025, following a status conference a few weeks prior, (*see* Dkt. (Minute Entry for Mar. 11, 2025)), the Court granted Defendants' stay request as to Dinsmore's claims and denied their request as to all other claims, (*see* Dkt. No. 53).

reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *Id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

As relevant here, Plaintiffs assert fourteen causes of Action in the SAC: unpaid overtime, unpaid wages, and unpaid spread of hour wages in violation of the FLSA and the NYLL (Claims One though Three, (SAC ¶¶ 260–82), and Claim Six, (*id.* ¶¶ 292–97)); record-keeping violations and notice and wage statement violations under the NYLL (Claims Four, (*id.* ¶¶ 283–86), and Seven, (*id.* ¶¶ 298–302)); unjust enrichment (Claim Five, (*id.* ¶¶ 287–91)); pregnancy and gender

discrimination under the NYSHRL (Claims Eight and Nine, (*id.* ¶¶ 303–23)); sexual harassment and gender discrimination under the NYSHRL (Claim Thirteen, (*id.* ¶¶ 349–58)); aiding and abetting under the NYSHRL (Claim Ten, (*id.* ¶¶ 324–29)); and retaliation under the NYLL, NYSHRL, and the FLSA (Claims Eleven, Twelve, and Fifteen (*id.* ¶¶ 330–48, 365–78)).[6]

In support of their Motion, Defendants assert, inter alia, that Plaintiffs have failed to state overtime claims because they did not allege sufficient allegations regarding any specific workweeks during which they worked overtime, nor the specific number of overtime hours they actually worked. (Defs' Mem. 18–24.) Similarly, Defendants argue that Plaintiffs have not alleged sufficient detail to support their unpaid wages or spread-of-wages claims. (*Id.* at 24–25.) Defendants further assert that Milanese has not provided specific allegations to support her FLSA and NYLL retaliation claims. (*Id.* at 15–16.) Finally, Defendants argue that Pullman, Milanese, and Dinsmore have failed to allege they were discriminated against on account of their gender and, relatedly, Plaintiffs have not sufficiently alleged that the Individual Defendants aided and abetted such discrimination. (*Id.* at 8–15.)

The Court will address Defendants' arguments to the extent necessary to resolve the instant Motions.

1. FLSA and NYLL Claims

a. FLSA and NYLL Overtime (Claims One and Two)

"To state an FLSA wage claim, a plaintiff must allege that: (1) he was the defendant's employee; (2) his work involved interstate activity; and (3) he worked for hours for which he did not receive minimum and/or overtime wages." *See Anderson v. Hudson Nat'l Golf Club, Inc.*,

[6] Although Dinsmore also asserts a claim for slander, libel, and defamation per se (Claim Fourteen), (*see id.* ¶¶ 359–64), Defendants do not move to dismiss this claim, (*see* Defs' Mem. 5–6).

No. 23-CV-522, 2024 WL 4241359, at *6 (S.D.N.Y. Sept. 19, 2024) (quoting *Hermida v. 101 Moronta Food Corp.*, No. 23-CV-4352, 2024 WL 3089962, at *2 (S.D.N.Y. June 20, 2024)); *see also Tackie v. Keff Enter., Inc.*, No. 14-CV-2074, 2014 WL 4626229, at *2 (S.D.N.Y. Sept. 16, 2014) (same); *Ramirez v. Sake II Japanese Rest., Inc.*, No. 20-CV-9907, 2023 WL 3354881, at *5 (S.D.N.Y. Apr. 24, 2023) (same), *report and recommendation adopted*, 2023 WL 3346768 (S.D.N.Y. May 10, 2023). "The requirements to make out a claim under the NYLL mirror the FLSA in most respects, except that the NYLL does not require a plaintiff to show that the employer was involved in interstate commerce or had $500,000 in minimum annual sales, as required for the interstate commerce element of an FLSA claim." *Soto v. Crismeli Deli Grocery Inc.*, No. 19-CV-10053, 2024 WL 3730115, at *5 (S.D.N.Y. June 28, 2024) (quotation marks and citation omitted), *report and recommendation adopted*, 2024 WL 3730300 (S.D.N.Y. Aug. 8, 2024). Accordingly, "the Court will consider Plaintiffs' overlapping FLSA and NYLL minimum wage and overtime claims together." *Anderson*, 2024 WL 4241359, at *7; *see Marcus v. Lominy*, No. 18-CV-1857, 2022 WL 493688, at *13 (S.D.N.Y. Feb. 17, 2022) ("[B]ecause the NYLL is the state analogue to the federal FLSA and it mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime, the [c]ourt's ensuing analysis . . . will solely focus on federal law but applies equally to [the plaintiff's] claims under the FLSA and the NYLL.").

For purposes of the instant Motion, Defendants do not dispute that Plaintiffs were their employees, or that Plaintiffs' work implicated interstate commerce. (*See generally* Defs' Mem.; *see also* SAC ¶¶ 263, 265).) Thus, the remainder of this section will focus on whether Plaintiffs plausibly alleged that they "worked for hours for which [they] did not receive . . . overtime wages." *Hermida*, 2024 WL 3089962, at *2.

Under the FLSA, "no employer shall employ any [] employees . . . for a workweek longer than forty hours" unless the employee receives compensation for [her] employment in excess of forty hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013); *see also Anderson*, 2024 WL 4241359, at *11 (same). "[A] plaintiff[] must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013). Accordingly, "a plaintiff must provide 'sufficient factual allegations . . . rather than a general and conclusory allegation as to the number of hours routinely worked—whereby the [c]ourt can reasonably infer that there was indeed one or more particular workweek(s) in which the plaintiff suffered an overtime violation.'" *Fallon v. 18 Greenwich Ave., LLC*, No. 19-CV-9579, 2021 WL 1105066, at *5 (S.D.N.Y. Mar. 23, 2021) (quoting *Humphrey v. Rav Investigative & Sec. Servs. Ltd.*, 169 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (internal quotation marks omitted)). Moreover, "[d]etermining whether a plausible [FLSA] claim has been pled is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Lundy*, 711 F.3d at 114 (quoting *Iqbal*, 556 U.S. at 679).

Here, Defendants argue that Plaintiffs fail to state overtime claims because they "merely parrot[] the statutory language . . . without providing any factually specific allegations." (Defs' Mem. 18.) Specifically, Defendants argue that Plaintiffs must allege the exact "hours [they] worked in any given workweek," "the number of weeks in which [they] worked overtime," "the

number of overtime hours [they] worked each week," and "the amounts [they were] paid per hour or week," but have failed to do so. (*Id.* at 20.) The Court disagrees.

It is true that "FLSA plaintiff[s] must provide a certain degree of specificity as to uncompensated hours worked during a particular week." *Hobbs v. Knight-Swift Transp. Holdings, Inc.,* No. 21-CV-1421, 2022 WL 118256, at *3 (S.D.N.Y. Jan. 12, 2022) (quoting *Chime v. Peak Security Plus, Inc.*, 137 F. Supp. 3d 183, 196 (E.D.N.Y. 2015)). However, contrary to Defendants' assertions, plaintiffs are not required to provide a laundry list of allegations to successful plead an FLSA claim. For instance, plaintiffs are not required to "keep 'careful records' of the number of hours worked each week or calculate and 'plead their hours with mathematical precision,'" let alone "provide a week-by-week recounting of the hours they worked." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 114–15 (2d Cir. 2023) (quoting *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 90 (2d Cir. 2013)); *see also Stewart v. Summit Health Mgmt., LLC*, No. 23-CV-4073, 2024 WL 3274687, at *4 (S.D.N.Y. July 1, 2024) (same); *Nam v. Ichiba Inc.*, No. 19-CV-1222, 2021 WL 878743, at *6 (E.D.N.Y. Mar. 9, 2021) (noting that a plaintiff "does not need to actually estimate the number of hours he [or she] worked in 'some or all workweeks'" (quoting *Dejesus*, 726 F.3d at 90)). Plaintiffs are also not required to specify their precise schedule or allege their rate of pay. *See Herrera*, 84 F.4th at 116 (rejecting argument that "a complaint must identify each week that the named [p]laintiffs worked their regular schedule" as "go[ing] too far"); *Nakahata*, 723 F.3d at 201 ("What aspects of [p]laintiffs' position, pay, or dates of employment are necessary to state a plausible claim for relief . . . is a case-specific inquiry . . . ." (emphasis omitted)); *Concha v. Brooklyn Bakery, Inc.*, No. 16-CV-6808, 2017 WL 11917972, at *4 (E.D.N.Y. May 31, 2017) (rejecting an argument that a "complaint must specify a plaintiff's rate of pay in order to state an FLSA overtime claim"). In

other words, while plaintiffs must plead their "overtime claims with 'specificity,' . . .[n]othing more is required." *Herrera*, 84 F.4th at 115 (citing *Nakahata*, 723 F.3d at 200).

Applying these principles, the Court concludes that Plaintiffs have pled their overtime claims with sufficient specificity. First, both Pullman and Dinsmore point to specific weeks that they worked over forty hours without being compensated for overtime. (*See* SAC ¶¶ 61–62 (Pullman alleging she worked forty-seven hours one week in March 2022 but was only paid for forty); *id.* ¶ 146 (Dinsmore listing twelve weeks between 2021 and 2023 where she "worked more than forty hours" but "was underpaid approximately eight[] to twenty-five[] hours of overtime each week").)[7] These allegations are sufficient to plead overtime claims for Pullman and Dinsmore. *See Lundy*, 711 F.3d at 114 ("[T]to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a *given workweek* as well as some uncompensated time in excess of the 40 hours." (emphasis added)); *Hosseini v. Miilkiina LLC*, No. 22-CV-1459, 2023 WL 7128092, at *4 (S.D.N.Y. Oct. 27, 2023) (finding plaintiff successfully pled an overtime claim where she alleged that "for each week in the month of February 2021, [the p]laintiff worked at least 50 hours each week"); *Katz*, 2022 WL 1292262, at *3 (denying motion to dismiss overtime claim where plaintiff "pled three specific weeks during which she worked more than [forty] hours without receiving overtime pay").

---

[7] Additionally, Pullman alleges that, for a six month period beginning in May 2018, she worked forty-eight hours a week for "at least three weeks a month" at Publick House 23 and five to ten hours of overtime at Melzingah approximately "one[] week per month," so that if she "was not working overtime at Melzingah, she would be working overtime at Publick House, always in the amount of approximately eight hours of overtime per week." (SAC ¶¶ 55–56.) Although these allegations are time barred under the FLSA's statute of limitations, they are timely under the NYLL's six-year statute of limitations. *See Anderson*, 2024 WL 4241359 at *14 ("The FLSA statute of limitations is two years for non-willful violations and three years for willful violation."(citation and quotation marks omitted)); *Tay v. New York & Presbyterian Hosp.*, No. 22-CV-8379, 2024 WL 4286226, at *17 (S.D.N.Y. Sept. 24, 2024) ("[T]he [NYLL] contains a six-year statute of limitations.").

Next, although Milanese does not point to a specific workweek in which she worked more than forty hours and was not compensated for it, she alleges that, from 2014 through her termination, she "worked *every* week more than [forty] hours in amounts from [forty-two] hours per week to [fifty] hours per week, yet was not paid overtime for any of those pay periods." (SAC ¶ 91 (emphasis added); *see id.* ¶ 89 (alleging Milanese worked forty-two to fifty hours per week without overtime compensation "throughout the entirety of her employment").) Courts have found that "allegations that the plaintiff worked over forty hours a week, *every week*, 'clearly satisfy the Second Circuit's edict that a complaint contain specificity as to uncompensated hours worked during a particular week.'" *Hobbs*, 2022 WL 118256, at *3 (emphasis added) (quoting *Kuck v. Planet Home Lending, LLC*, 354 F. Supp. 3d 162, 168 (E.D.N.Y. 2018)). Accordingly, Milanese's allegations—particularly with the context that she always picked up additional shifts outside her regularly scheduled hours, which often changed, (SAC ¶¶ 88–89)—are sufficient to raise the inference that she was uncompensated for overtime hours, *see Brain v. Execu-Search Grp., LLC*, No. 22-CV-8219, 2024 WL 838085, at *3 (S.D.N.Y. Feb. 28, 2024) (denying motion to dismiss overtime because, "[a]lthough [the plaintiff] does employ the word 'regularly' several times throughout her pleading, drawing inferences in the light most favorable to [the plaintiff], . . . [she] plausibly alleges that she in fact worked in excess of forty hours *each and every* week" (emphasis in original)); *Hobbs*, 2022 WL 118256, at *4 (concluding that plaintiffs' allegations that they "*always* worked 24 hours per day every day of their employment" sufficient to state an overtime claim (emphasis added)); *Werst v. Sarar USA Inc.*, No. 17-CV-2181, 2018 WL 1399343, at *6 (S.D.N.Y. Mar. 16, 2018) (denying motion to dismiss FLSA claim where, in addition to allegations that they "regularly" worked overtime, one plaintiff alleged she worked over forty hours in a specific week and another plaintiff provided a

detailed chart of his weekly shifts); *Kuck*, 354 F. Supp. 3d at 168–70 (concluding that allegations that "[p]laintiffs worked 50–55 hours during every single week of their employment" sufficient to state an overtime claim).

Finally, although Knanishu does not point to a specific week or allege that she worked overtime every week, instead alleging that she "typically" worked overtime that was uncompensated, (SAC ¶¶ 122, 129), the Court finds that she, too, has made out an overtime claim. While Defendants are correct that "[a]llegations that a plaintiff typically, occasionally, or regularly worked more than forty hours a week, without more, are insufficient to state a claim," *Hobbs*, 2022 WL 118256, at *3 (quoting *Limauro v. Consol. Edison Co. of New York, Inc.*, No. 20-CV-03558, 2021 WL 1226872, at *2 (S.D.N.Y. Mar. 31, 2021) (internal quotations omitted)), Knanishu does not rely solely those allegations. For instance, Knanishu also provides specific details about her schedule, (SAC ¶¶ 122, 126–27, 129, 133), including that it "was never consistent as it varied based on the needs of Defendants . . . and how late the establishments stayed open," (*see id.* ¶ 128). She further alleges that—although she was "unsure how many hours she was working each week" given her inconsistent schedule, her lack of documentation as an "on the books" employee, and her young age—she consistently worked forty-five hours a week, if not more, and was not compensated for the overtime. (*See id.* ¶¶ 130, 132, 133.)

Accordingly, and keeping in mind the Second Circuit's admonition to avoid "too crabbed a reading of the [SAC]" or "foreclose relief to plaintiffs who neglected to keep 'careful records' of the hours they worked," *Herrera*, 84 F.4th at 115–116 (citing *Dejesus*, 726 F.3d at 90), the Court concludes that Knanishu has provided sufficient allegations to support the inference that she worked overtime for which she was uncompensated, *see Collison v. WANDRD, LLC*, 737 F. Supp. 3d 231, 239 (S.D.N.Y. 2024) (concluding that a plaintiff successfully pled an overtime

claim where he alleged "he regularly worked more than forty hours a week and typically worked approximately ten to twenty overtime hours each week"); *Humphrey v. Rav Investigative & Sec. Servs. Ltd.*, 169 F. Supp. 3d 489, 497 (S.D.N.Y. 2016) (concluding that a plaintiff pled an overtime claim where "he had a scheduled workweek consisting of four ten-hour shifts, but was also required to arrive early to each shift for specific reasons, and he believe[d] this uncompensated time averaged out to two and one-half hours per week"); *see also Werst*, 2018 WL 1399343, at *6 (noting that, while "certain of [p]laintiffs' allegations . . . viewed in isolation do not meet the pleading requirement . . .[,] other allegations in the [a]mended [c]omplaint provide further factual context for [p]laintiffs' overtime claim").

Accordingly, Defendants' Motion is denied as to Plaintiffs' overtime claims.

b. NYLL Unpaid Wages Claim

Defendants next contend—somewhat offhandedly—that Plaintiffs have failed to state a claim for unpaid wages under the NYLL. (*See* Defs' Mem. 24–25.) Again, the Court disagrees.

Under the NYLL, "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she shall recover in a civil action the amount of any such underpayments." N.Y. Lab. Law § 663(1); *Isayeva v. Diamond Braces*, No. 22-CV-4575, 2024 WL 1053349, at *5–6 (S.D.N.Y. Mar. 11, 2024) (noting that "[w]hile the FLSA does not provide a cause of action for recovery of unpaid wages by employees who have worked fewer than 40 hours in a week, . . . the NYLL permits 'an employee [who] has not worked 40 hours in a given week' to bring a 'gap-time claim . . . seek[ing] recovery of unpaid time worked'" (citing *Nakahata*, 723 F.3d at 201–02)). "Unlike an overtime claim, 'a gap-time claim requires no predicate showing of minimum hours worked; rather, an allegation of hours worked without compensation may give rise to a gap-time claim.'" *Werst*,

2018 WL 1399343, at *7 (citing *Nakahata*, 723 F.3d at 202); *Isayeva*, 2024 WL 1053349, at *17 ("[T]o the extent that [plaintiff] 'has adequately pled that [she] worked compensable time for which [she] was not properly paid, [she has] a statutory right under the NYLL to recover straight-time wages for those hours.'" (quoting *Lundy*, 711 F.3d at 118)). NYLL gap-time claims are analyzed under the same pleading standard as for FLSA overtime claims. *See Isayeva*, 2024 WL 1053349, at *18 ("As the NYLL incorporates the FLSA into its statutory framework, and courts apply the same pleading standard for both statutes, including the degree of specificity needed to state a claim, the Second Circuit's guidance in *Herrera* is just as relevant to the Court's evaluation of Isayeva's claims."); *see also Werst*, 2018 WL 1339343, at *7 (applying the FLSA pleading standard to NYLL gap-time claims); *Amponin v. Olayan Am. Corp.*, No. 14-CV-2008, 2015 WL 1190080, at *2 (S.D.N.Y. Mar. 16, 2015) (same).

Here, as discussed above, Plaintiffs have successfully pled that they worked overtime hours without compensation. (*See, e.g.*, SAC ¶¶ 75, 96, 133, 143.) They also allege that Defendants routinely wrote off their time if they worked in excess of forty hours a week or ten hours a day, (*see id.* ¶¶ 64, 95, 107, 146–47, 199), altered and underpaid Plaintiffs' credit card tips, (*id.* ¶¶ 47, 60, 66, 76, 101, 103–04), and frequently withheld payment for *non*-overtime hours, (*see id.* ¶¶ 48, 58, 77, 101–03, 130–31, 138, 144, 149, 155, 200). Moreover, they also allege that they were not provided with lunch or rest breaks and did not receive compensation for hours spent training other employees. (*See id.* ¶¶ 78, 84, 98, 100, 137.) These allegations are sufficient to state claims for gap-time wages for each named Plaintiff. *See Werst*, 2018 WL 1339343, at *7 (concluding gap-time claims were adequately pled where plaintiffs alleged "lunch breaks that were interrupted or non-existent" and alleges that defendants "arbitrarily wr[ote] time off on a regular basis if employees' hours exceeded [forty] hours in a workweek"); *see also*

*Isayeva*, 2024 WL 1053349, at *18 (finding a plaintiff adequately pled a gap-time claim where she alleged she was forced to clock out for a break, work during that break, and was not compensated for that time); *Bowen v. Baldwin Union Free Sch. Dist.*, No. 15-CV-6829, 2018 WL 4560726, at *7 (E.D.N.Y. Aug. 31, 2018) ("To the extent plaintiff has plausibly alleged his entitlement to overtime compensation, he also has pleaded his right to recover straight time compensation for work performed in excess of 35 hours, but totaling 40 or less hours in a particular week."), *report and recommendation adopted*, No. 15-CV-6829, 2018 WL 4558403 (E.D.N.Y. Sept. 21, 2018). Accordingly, Defendants' Motion is denied as to Plaintiffs' unpaid wages claims.

c. <u>NYLL Spread-of-Hours Claims</u>

New York law requires employers to pay "one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required . . . for any day in which (a) the spread of hours exceeds 10 hours." 12 N.Y.C.R.R. § 142-2.4. "'Spread of hours' means 'the interval between the beginning and end of an employee's workday.'" *Gao v. Savour Sichuan Inc.*, No. 19-CV-2515, 2024 WL 664718, at *23 (S.D.N.Y. Feb. 16, 2024) (quoting 12 N.Y.C.R.R. § 142-3.16), *reconsideration denied*, No. 19-CV-2515, 2024 WL 3471295 (S.D.N.Y. July 19, 2024).

Here, Pullman, Milanese, and Dinsmore allege that they worked in excess of ten hours per day multiple days a week during their employment. (*See* SAC ¶ 64 (Pullman alleging she "worked more than ten hours in one day . . . at least two[] days a week every week she was employed"); *id.* ¶ 90 (Milanese alleging she "frequently worked over ten[] hours a day each weekend shift . . .[,] approximately two days per week"); *id.* ¶ 147 (Dinsmore alleging she "frequently worked more than ten hours in one day (approximately two days per week)").) Accordingly, they have successfully pled spread-of-hours claims under the NYLL. *See Moses v.*

*Griffin Indus., LLC*, 369 F. Supp. 3d 538, 545 (S.D.N.Y. 2019) (concluding that plaintiffs pled a spread of hours claim where they alleged "they worked days that began and ended more than ten (10) hours apart in a single day" (internal quotation marks omitted)); *cf. Gao*, 2024 WL 664718, at *24 (holding, after a bench trial, that plaintiffs were entitled to spread-of-hours pay where they worked shifts spanning over ten hours a day).

However, Knanishu has not alleged that she worked more than ten hours in a day without proper compensation. (*See generally* SAC ¶¶ 121–39.) Accordingly, she has not stated a spread-of-hours claim and thus, Defendants' Motion is granted only as to Knanishu's spread-of-hours claim.

d. FLSA and NYLL Retaliation Claims: Milanese[8]

Under the FLSA's anti-retaliation provision, "it [is] unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." *See* 29 U.S.C. § 215(a)(3). Similarly, the NYLL provides that "[n]o employer . . . shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee [] because such employee has made a complaint to his or her employer, or to . . . any other person, that the employer has engaged in conduct that the employee . . . believes violates any provision of this chapter." *See* N.Y. Lab. Law § 215(1)(a).

"Given the significant overlap in the pleading requirements for retaliation claims under the FLSA and NYLL, courts analyze both statutes under the same standards for the purposes of a motion to dismiss." *Isayeva*, 2024 WL 1053349, at *6 (citing *Rosenbaum v. Meir*, 658 F. Supp.

[8] Although both Milanese and Dinsmore assert retaliation claims under the FLSA and the NYLL, (SAC ¶¶ 330–41, 365–78), Defendants do not seek to dismiss Dinsmore's claims, (Reply 12 n.2).

3d 140, 149–50 (E.D.N.Y. 2023)) (internal quotation marks omitted) (alterations adopted). To allege a retaliation claim under either statute, "a plaintiff must plead facts showing a prima facie case of retaliation, namely: (1) participation in protected activity known to the defendant[s]; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Wang*, 157 F. Supp. 3d at 326–27 (quoting *Salazar v. Bowne Realty Assocs*., *L.L.C*., 796 F. Supp. 2d 378, 384 (E.D.N.Y. 2011)); *see also Carrasco v. Metro. Transit Auth*., No. 24-CV-4265, 2025 WL 1939052, at *5 (S.D.N.Y. July 15, 2025) ("A plaintiff alleging retaliation under the NYLL must first show '(1) plaintiff's participation in protected activity known to the defendant, like the filing of a NYLL lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" (quoting *Williams v. Harry's Nurses Registry, Inc*., No. 24-CV--34, 2025 WL 842041, at *3 (2d Cir. Mar. 18, 2025) (summary order) (alterations adopted))); *Tongring v. Bronx Cmty. Coll. of City Univ. of N.Y. Sys*., No. 12–CV–6854, 2014 WL 463616, at *4 (S.D.N.Y. Feb. 4, 2014) (same, for FLSA claims).[9]

---

[9] "FLSA retaliation claims are subject to the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 1973)." *Wang*, 157 F. Supp. 3d at 328 (alterations adopted) (internal citations and quotation marks omitted). Under that framework, if a plaintiff makes out a prima facie case of retaliation, the burden then shifts to the employer to demonstrate a legitimate reason for the adverse employment action. *See id.* (citing *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)). Finally, if the employer satisfies this requirement, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reason was merely a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804–05; *see also Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (articulating the three-step *McDonnell Douglas* framework).

Because "a plaintiff is not required to plead a prima facie case under *McDonnell Douglas*, at least as the test was originally formulated, to defeat a motion to dismiss," *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (italics omitted), the Court need only address the first stage of the *McDonnell Douglas* framework, *see Herling v. New York City Dep't of Educ.*, No. 13-CV-5287, 2014 WL 1621966, at *8 (E.D.N.Y. Apr. 23, 2014) ("[A] plaintiff need not plead facts sufficient to establish a prima facie case of retaliation to survive a

With respect to the causal connection requirement, a plaintiff may specifically allege such a connection either "directly, by alleging facts of a retaliatory animus against [her]," or "indirectly, either by showing a temporal relationship in which the protected activity was followed closely in time by discriminatory treatment, or by other circumstantial evidence." *Wang*, 157 F. Supp. 3d at 327 (quoting *McManamon*, 2013 WL 3466863, at *12); *see also Herling v. N.Y.C. Dep't of Educ.*, No. 13-CV-5287, 2014 WL 1621966, at *10 (E.D.N.Y. Apr. 23, 2014) (same). "At the prima facie stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity," *Risco v. McHugh*, 868 F.Supp.2d 75, 114 (S.D.N.Y. 2012) (italics omitted); however, "[t]he cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted); *see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (noting that "temporal proximity must be very close" for purposes of retaliation claim (internal quotation marks omitted)). "[T]here is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a [protected activity] and an allegedly

---

motion to dismiss" but rather, "the ordinary rules for assessing the sufficiency of a complaint apply"); *Munoz-Nagel v. Guess, Inc.*, No. 12-CV-1312, 2013 WL 6068597, at *1 (S.D.N.Y. Nov. 15, 2013) ("[A] [p]laintiff need not make out a prima facie case at the pleading stage, and may withstand a motion to dismiss by providing a short and plain statement of the claim that shows that she is entitled to relief . . . that gives [the defendant] fair notice of the . . . [retaliation] claim and the grounds upon which it rests." (italics and citation omitted)). "The elements of a prima facie case do, however, 'provide an outline of what is necessary to render [a plaintiff's retaliation] claims for relief plausible.'" *McManamon v. Shinseki*, No. 11-CV-7610, 2013 WL 3466863, at *4 (S.D.N.Y. July 10, 2013) (quoting *Sommersett v. City of New York*, No. 09-CV-5916, 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011)) (italics omitted); *Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d. 301, 312–313 (S.D.N.Y. 2015) (collecting cases).

retaliatory action. . . .'" *Cf. Abrams*, 764 F.3d at 254 (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001)).

Defendants do not argue that Milanese's complaints are not protected activity under either statute or that her termination is not an adverse employment action. (*See generally* Defs' Mem.; Reply.) Instead, they argue Milanese has not sufficiently alleged any causal connection between that termination and "her alleged complaints of improper pay practices." (Reply 12.) The Court agrees.

Milanese appears to assert a casual connection primarily on the basis of temporal proximity. (*See* Pls' Opp. 18 ("The timing of Plaintiff Milanese['s] . . . termination[] . . . strongly indicates retaliatory motives related to [her] complaints . . . .").) Specifically, Plaintiffs point to four instances where Milanese allegedly engaged in protected activities: (1) when she "complained about not receiving overtime or spread of hours pay around March 17, 2017," (Pls' Opp. 17 (citing SAC ¶ 92)); (2) when "Dinsmore and Milanese sent text messages, including one about a paycheck dated December 23, 2020, indicating Milanese's paycheck was short," (*id.* (citing SAC ¶ 97)); (3) when Milanese "lodg[ed] multiple employment complaints regarding improperly pay practices on or around . . . November[] 2021 . . . and w[as] terminated," (*id.* (citing SAC ¶¶ 109–10)); and (4) when, at some point "on or after COVID-19, in 2020, Milanese often did not receive a paycheck or paystub and repeatedly brought this to [Dana] Collins' attention without resolution," (*id.* (citing SAC ¶ 109)). None of these allegations saves Milanese's claim.

First, the November 2021 allegations and those occurring in 2020 after COVID-19 suffer from a crucial flaw: neither date actually appears in the SAC. (*See* SAC ¶¶ 109–10.) Because it is well established that "a party is not entitled to amend [their] pleading through statements in

[their] brief," *Lenzo v. City of New York*, No. 21-CV-306, 2022 WL 656831, at *4 (S.D.N.Y. Mar. 4, 2022) (citation and quotation marks omitted), Plaintiffs cannot rely upon these alleged dates to establish temporal proximity, *see also Cota v. Art Brand Studios, LLC*, No. 21-CV-1519, 2021 WL 4864588, at *14 (S.D.N.Y. Oct. 15, 2021) (declining to consider allegations that "feature prominently in [plaintiffs'] briefing" because they "are not included in [plaintiffs'] complaint"); *Saveene Corp. v. Remo*, No. 21-CV-399, 2021 WL 4806380, at *4 (S.D.N.Y. Oct. 14, 2021) (same).[10]

Second, neither of the remaining complaints—i.e., the March 2017 complaint and the December 2020 text messages—is close enough in time to Milanese's January 2022 termination to support an inference of a retaliatory motive. Indeed, some "courts in this Circuit have . . . held that a passage of *more than two months* between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. City of New York*, No. 23-CV-10031, 2024 WL 3553266, at *9 (S.D.N.Y. July 26, 2024) (emphasis added) (citation and alterations omitted); *Feliciano v. City of New York*, No. 14-CV-6751, 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) ("[T]emporal proximity ordinarily requires that the allegedly retaliatory act occur within two months of the plaintiff's protected activity." (collecting cases)). *But see Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021) ("[T]he passage of up to six months between an adverse action and protected activity [may be] sufficient to permit an inference of causation."). Accordingly, the time periods between the complaints and her termination that Milanese alleges here—either five years or thirteen months—are far too

[10] Further undercutting the plausibility of these allegations, while Plaintiffs claim in their Opposition that Milanese made two *separate* complaints in 2020 and 2021, Plaintiffs cite to the *exact same* paragraphs in the SAC for both alleged incidents. (*See* Pls' Opp. 17 (citing SAC ¶¶ 109–10).)

attenuated to establish temporal proximity. *See Applewhite v. N.Y.C. Dep't of Educ.*, No. 21-CV-2928, 2024 WL 3718675, at *19 (E.D.N.Y. Aug. 8, 2024) (holding that an adverse action occurring "over [twenty-two] months" after plaintiff engaged in the protected activity was "too remote to allow the [c]ourt to infer a causal link"), *aff'd sub nom. Applewhite v. N.Y.C. Dep't of Educ.*, No. 24-2131-CV, 2025 WL 783650 (2d Cir. Mar. 12, 2025); *see also Moore v. Verizon*, No. 13-CV-6467, 2016 WL 825001, at *15 (S.D.N.Y. Feb. 5, 2016) (concluding that the four-month interval between plaintiff's complaint and an adverse employment action could not "raise an inference of causation sufficient to survive a motion to dismiss" and collecting cases).

Third, even if the December 2020 text messages could establish temporal proximity, they demonstrate only that Milanese complained to a *colleague*, not that her employer was aware of the complaints. But it is axiomatic that a plaintiff "must establish [their] participation in protected activity *known* to the defendants." *Wang*, 157 F. Supp. 3d at 331 (alterations adopted and citations and quotation marks omitted); *see also Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) ("[T]here must be some basis to conclude that the employer was aware that the plaintiff engaged in protected activity." (quoting *Lucio v. N.Y.C. Dep't of Educ.*, 575 F. App'x 3, 6 (2d Cir. 2014) (summary order))). Thus, this allegation, without more, cannot form the basis of her claim. *See Wang*, 157 F. Supp. 3d at 331–333 (dismissing retaliation claim where, inter alia, plaintiff did not allege that defendants knew of plaintiff's complaint when they refuse to hire plaintiff for certain positions); *Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 355 (S.D.N.Y. 2014) (concluding that the plaintiff failed to "establish[ ] that he engaged in a protected activity known to the defendant as required to state a retaliatory discharge claim under the FLSA," because he did not "allege[ ] that [the] [d]efendant had any knowledge of this

complaint, nor has he pleaded facts from which this [c]ourt could infer such knowledge" (citations, emphasis, and internal quotation marks omitted)).

Accordingly, Milanese's retaliation claims under the FLSA and the NYLL are dismissed.

2. NYSHRL Claims

a. Gender Discrimination: Pullman and Milanese (Claims Eight and Nine)

Next, Defendants seek to dismiss Pullman and Milanese's gender discrimination claims, alleging that they pled insufficient facts to support an inference of discrimination. (*See* Defs' Mem. 8–12.)

Under the NYSHRL, "discrimination on the basis of pregnancy constitutes discrimination on the basis of sex." *Ong v. Deloitte Consulting, LLP*, No. 21-CV-2644, 2025 WL 886947, at *10 (S.D.N.Y. Mar. 21, 2025) (quotation omitted); *see also Lettieri v. Anti-Defamation League Found*, No. 22-CV-9889, 2023 WL 5152447, at *6 (S.D.N.Y. Aug. 10, 2023) ("Though . . . the NYSHRL [does not] explicitly name[] pregnancy as a type of actionable discrimination, courts have deemed pregnancy discrimination actionable under [the NYSHRL.]" (quoting *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 357 (S.D.N.Y. 2012))). Until recently, federal discrimination claims and NYSHRL discrimination claims "were generally treated as analytically identical." *Edelman v. NYU Langone Health Sys.*, No. 21-CV-502, 2022 WL 4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (quotation marks omitted). However, in 2019, the NYSHRL was amended to provide that "[t]he provisions of this article shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300 (2023); *Everett v. N.Y.C. Dep't of Educ.*, No. 21-CV-7043, 2023 WL 5629295, at *11 (S.D.N.Y. Aug. 31, 2023) (discussing the

amended NYSHRL). Although New York courts have not yet weighed in on how this amendment changes the standard of liability for discrimination claims, many courts in this District interpret the amendment as "render[ing] the standard for claims closer to the standard of the [New York City Human Rights Law ('NYCHRL')]," which mandates a similarly liberal construction. *Everett*, 2023 WL 5629295, at *11 (quoting *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)); *see also Forbes v. Tri-Cnty. Care, LLC*, No. 21-CV-1366, 2025 WL 743945, at *9 (S.D.N.Y. Mar. 7, 2025) ("[F]ollowing a 2019 amendment, for claims that accrued on or after the effective date of the legislation, the standard for NYSHRL claims is closer to the standard of the [NYCHRL]." (quotation omitted) (alterations adopted)); *Kulick v. Gordon Prop. Grp., LLC*, No. 23-CV-9928, 2025 WL 448333, at *8 (S.D.N.Y. Feb. 7, 2025) (collecting cases); *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 245 (S.D.N.Y. 2024) ("Following the New York legislature's 2019 amendment to the NYSHRL, courts must now scrutinize discrimination claims brought pursuant to the NYSHRL under the same lenient pleading standard described above under which NYCHRL discrimination claims are analyzed." (citation omitted)).[11]

---

[11] The Court acknowledges that some courts in this District still apply the federal standard to post-amendment NYSHRL discrimination claims and apply the more lenient NYCHRL standard only to hostile work environment claims under the NYSHRL. *See, e.g.*, *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 451, 455 (S.D.N.Y. 2023) (applying the NYCHRL standards to hostile work environment claims under the NYSHRL but applying federal discrimination standards to NYSHRL discrimination claims); *Ndongo v. Bank of China Ltd.*, No. 22-CV-05896, 2023 WL 2215261, at *4, *8 (S.D.N.Y. Feb. 24, 2023) (same); *see also Williams v. Samaritan Daytop Vill. Woodside Senior Ctr.*, No. 23-CV-10323, 2025 WL 850547, at *10 n.4 (S.D.N.Y. Jan. 29, 2025) ("Unlike discrimination and retaliation claims, hostile work environment claims under the NYSHRL are governed by a more lenient standard than under Title VII."), *report and recommendation adopted,* No. 23-CV-10323, 2025 WL 836834 (S.D.N.Y. Mar. 14, 2025). However, the parties do not dispute that the more lenient standard should apply to Plaintiffs discrimination claims. (*See* Defs' Mem. 8 (noting that, post-amendment, "[c]ourts now apply a more lenient standard to evaluate these claims on a motion to

In light of this amendment, a plaintiff "need not allege that she suffered an adverse employment action or that 'discriminatory animus was the but-for cause or even the primary motivation of their alleged mistreatment.'" *Kulick*, 2025 WL 448333, at *8 (quoting *Delo v. Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 183 (S.D.N.Y. 2023)). Instead, it is enough that a plaintiff "allege[s] only that they have been 'treated less well at least in part because of [their] gender.'" *Id.* (quoting *Delo*, 685 F. Supp. 3d at 183); *Everett*, 2023 WL 5629295, at *11 (noting that, post-amendment, "[a] plaintiff need only show that she was 'treated . . . less well, at least in part for a discriminatory reason'" (quoting *Khwaja v. Jobs to Move Am.*, No. 19-CV-7070, 2021 WL 3911290, at *3 (S.D.N.Y. Sept. 1, 2021))); *cf. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (noting that, under the analogous NYCHRL, "the plaintiff need only demonstrate . . . that she has been treated less well than other employees because of her gender").

However, "'even under the more lenient requirements of the NYCHRL [and NYSHRL], plaintiff[s'] claims must be more than conclusory or speculative to survive a motion to dismiss.'" *Ward v. Cohen Media Publ'ns LLC*, No. 22-CV-6431, 2023 WL 5353342, at *15 (S.D.N.Y. Aug. 21, 2023) (quoting *Dechbery v. City of New York*, No. 14-CV-2130, 2017 WL 11683338, at *9 (E.D.N.Y. Mar. 31, 2017)). Moreover, despite the more liberal pleading standard, the NYSHRL "is still not a general civility code, and petty slights and trivial inconveniences are not actionable." *Maynard v. Montefiore Med. Ctr.*, No. 18-CV-8877, 2021 WL 396700, at *8

dismiss," but asserting that "Plaintiffs' discrimination claims should still be dismissed even under the more lenient standards of the NYSHRL"); Pls' Opp. 7 ("The NYSHRL was amended on October 11, 2019 to eliminate the 'severe or pervasive' requirement in favor of a more lenient standard of liability." (internal quotation marks omitted)). Moreover, "in order to view the [SAC] in the light most favorable to Plaintiff," the Court will apply the more lenient standard. *See Kulik*, 2025 WL 448333, at *8 (assuming for the purpose of a motion to dismiss "that the amended NYSHRL aligns with the NYCHRL").

(S.D.N.Y. Feb. 4, 2021) (quoting *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012) (internal quotation marks omitted)); *see also Kulick*, 2025 WL 448333 at *9 (noting a plaintiff still must allege "treatment that is 'more than trivial, insubstantial, or petty'" (quoting *Torre* v. *Charter Comm'cns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020))).

Here, even under this lenient standard, Pullman has failed to allege discrimination under the NYSHRL. The sum total of Pullman's pregnancy discrimination allegations is that Defendants did not pay her NYPFL while she was out on leave after giving birth—despite Defendants deducting NYPFL funds from her pay—and "forced her to return to work" a month and a half after her child's birth "instead of pay her for her leave." (SAC ¶¶ 81.) These allegations are insufficient to infer Pullman was treated less well *because of* her pregnancy. For instance, Pullman does not allege that she was actually entitled to NYPFL (only that "Defendants never informed" her that she was), does not allege that other, non-pregnant employees received paid leave that they were entitled to, or allege that Defendants made any comments to her that could suggest a discriminatory motive. In other words, even under the lenient "less well" standard, "her allegations lack a plausible inference that her [pregnancy] motivated any of [Defendants'] alleged actions." *See Doolittle v. Bloomberg L.P.*, No. 22-CV-9136, 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023) (dismissing a discrimination claim under the NYSHRL because plaintiff failed to plausibly allege that the defendant's actions were motived by plaintiff's age); *cf. Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 580–581 (S.D.N.Y. 2023) (noting "the defendant's offending conduct must have been keyed to a protected characteristic of the plaintiff" and concluding that "a handful of comments relating to sex . . . [fell] far short of stating an NYCHRL claim"); *Shukla v. Deloitte Consulting LLP,* No. 119-CV-10578, 2020 WL

3181785, at *11 (S.D.N.Y. June 15, 2020) (dismissing NYCHRL claims where plaintiff "ha[d] not plausibly alleged that he was treated less well based upon his gender").

Milanese, however, is a different story. Although Milanese repeats the same conclusory allegations regarding her being denied NYPFL, (*see* SAC ¶ 115), she also alleges that in 2022, six months after she returned from her maternity leave, Defendants terminated her and informed her "they had wanted to terminate her when she was pregnant because her pregnancy caused her to be unable to come into work," (*id.* ¶ 118). This allegation is sufficient to infer that Milanese was treated "less well" because of her pregnancy. *See Moore*, 722 F. Supp. 3d at 252 (denying motion to dismiss where allegations that defendant wanted to terminate plaintiff because of her protected characteristic went "beyond the mere inferior treatment needed to plead NYCHRL and NYSHRL claims"); *Peterec*, 2024 WL 4337526, at *8 (allegations that plaintiff was "told he had to leave work in part because of his [protected characteristic] . . . militate[d] [in favor of] a finding that [plaintiff] was treated less well on the same basis" (quoting *Verne v. New York City Dep't of Educ.*, 697 F. Supp. 3d 30, 61 (S.D.N.Y. 2023)); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 326–27 (S.D.N.Y. 2020) (denying motion to dismiss as defendant's comments about plaintiff's pregnancy, including that defendant "believed [plaintiff] simply could not keep up with the physical requirements of the work," supported an inference of discriminatory motive even under the pre-amendment NYSHRL standard); *cf. Yan v. Ziba Mode Inc.*, No. 15-CV-47, 2016 WL 1276456, at *4 (S.D.N.Y. Mar. 29, 2016) (noting that "verbal comments may evince discriminatory motivation when a plaintiff shows that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff" (internal quotation marks and citation omitted)); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 n.12 (2d Cir. 2004) (holding, at summary judgment for a Title

VII claim, that comments were not mere "stray remarks" where they "drew a direct link between gender stereotypes and the conclusion that [the plaintiff] should not be tenured," and "were made by supervisors who played a substantial role in the decision to terminate").

Accordingly, Defendants' Motion is granted as to Pullman's discrimination claim but denied as to Milanese's discrimination claim.

b. Hostile Work Environment: Dinsmore (Claim Thirteen)

Next, Defendants argue that Dinsmore has failed to state a sexual harassment claim because she points to only "two isolated and unrelated instances," which are insufficiently severe to establish a hostile work environment. (Defs' Mem. 14–15.)

To begin, Defendants cite to the incorrect standard. Pre-amendment NYSHRL hostile work environment claims were analyzed in the same manner as Title VII claims, which require plaintiff to allege misconduct "that is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment." *Ancrum v. New York City Dep't of Env't Prot.*, No. 23-CV-10978, 2024 WL 5009145, at *5 (S.D.N.Y. Dec. 6, 2024) (alterations adopted) (citing *Littlejohn*, 795 F.3d at 320–21); *see Everett*, 2023 WL 5629295 at *12 (noting "NYSHRL and Title VII hostile work environment claims were analyzed in the same manner" prior to 2019). However, as with other discrimination claims, post-amendment NYSHRL hostile work environment claims require a plaintiff to show only that "they were subjected to inferior terms, conditions, or privileges of employment because of [their] membership in one or more protected categories." *Peterec*, 2024 WL 4337526, at *8; *see also Samuels v. City of New York*, No. 22-CV-1904, 2023 WL 5717892, at *9 (S.D.N.Y. Sept. 5, 2023) (same). "Under that standard, 'the action's shorthand[] name is somewhat of a misnomer' as a plaintiff need not plead comments that are outright 'hostile' to state a claim." *Peterec*, 2024 WL

4337526, at *8 (quoting *Verne*, 697 F. Supp. 3d at 61 (discussing the analogous NYCHRL standard)). Instead, it is enough that a plaintiff "allege[s] only that they have been 'treated less well at least in part because of [their] gender.'" *Kulick*, 2025 WL 448333, at *8 (quoting *Delo*, 685 F. Supp. 3d at 183); *see Peterec*, 2024 WL 4337526, at *8 (same).[12] Accordingly, a NYCHRL claim—and thus, a post-amendment NYSHRL claim—cannot survive a motion to dismiss "only when it raises a 'truly insubstantial case in which [the] defendant's behavior cannot be said to fall within the broad range of conduct that falls between severe and pervasive on the one hand and a petty slight or trivial inconvenience on the other.'" *Cf. Moazzaz v. MetLife, Inc*, No. 19-CV-10531, 2021 WL 827648, at *8 (S.D.N.Y. Mar. 4, 2021) (quoting (*Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 58–89 (App. Div. 2012)).

Here, the Court concludes that Dinsmore has adequately alleged that she was treated less well because of her gender. All Plaintiffs, including Dinsmore, allege that they "were subjected to inappropriate sexual commentary on an almost near daily basis" from the kitchen staff at Publick House, who would "grab at the Plaintiffs . . ., comment on their bodies, [and] ask if they liked giving oral sex." (SAC ¶ 186.) Moreover, Dinsmore points to an occasion where a customer "video-tap[ed] underneath her skirt," (*id.* ¶ 184), as well as a specific November 2024 incident where a chef "shout[ed] at Dinsmore to give him oral sex," (*id.* ¶ 187). Under the NYSHRL's lenient standard, these allegations are sufficient to show that Dinsmore, at least, was

---

[12] "[A] cause of action for discrimination under the NYSHRL accrues . . . on the date of the alleged discriminatory act." *Fair Hous. Just. Ctr., Inc.* v. *JDS Dev. LLC*, 443 F. Supp. 3d 494, 504 (S.D.N.Y. 2020) (internal quotation marks omitted and alteration adopted). Thus, "the pre-amendment standard applies to acts alleged to have occurred prior to October 11, 2019" and "the post-amendment standard applies to conduct alleged to have taken place after October 11, 2019." *Kulick*, 2025 WL 448333, at *8. However, "where the complaint is ambiguous as to when the conduct took place"—as some of the hostile conduct alleged here—the post-amendment standard applies "so as to construe the allegations in the light most favorable to the [p]laintiff." *Id.*

treated less well because of her gender. *See Kulik*, 2025 WL 448333, at *9–10 (noting that "[e]ven a 'single comment that objectifies women . . . made in circumstances where that comment would, for example, signal views about the role of women in the workplace [can] be actionable'" and finding that comments about female employee's "weight and appearance" "objectif[ied] women" (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 n.30 (App. Div. 2009)); *see also Ward*, 2023 WL 5353342, at *12 (denying motion to dismiss where plaintiff alleged, inter alia, that defendant "regularly made sexist remarks about women," "implicitly permitt[ed] men to look up women's skirts . . . and [took] no action when [the plaintiff] complained about this").[13]

Nonetheless, Defendants assert that Dinsmore's claim must fail because "Defendants cannot be held liable for the alleged harassment by Plaintiffs' co-workers under the NYSHRL" unless Defendants "encourage[ed], condon[ed], or approv[ed]" the harassment. (Defs' Mem. 13 (citations omitted).) Indeed, under the NYSHRL, an employer is only liable for the discriminatory acts of its employees if "the employer acquiesced in the discriminatory conduct or

[13] Defendants' authority does not change the calculus. Although Defendants claim that these incidents are insufficient to plead a hostile work environment, they point only to cases with claims brought under Title VII's "severe and pervasive" standard, rather than under the more lenient "less well" standard that applies here. (Defs' Mem. 14–15 (citing *Ancrum*, 2024 WL 5009145, at *6 (dismissing Title VII claims where plaintiff "fail[ed] to plausibly allege facts tending to show that she was subject to severe or pervasive sexual harassment" and failed to allege facts to show that the harassment was "in any way connected to . . . [plaintiff's] workplace in general"), *Veras v. N.Y.C. Dep't of Educ.*, No. 22-CV-00056, 2024 WL 3446498, at *6 (S.D.N.Y. July 17, 2024) (granting motion to dismiss Title VII claim where the allegations "d[id] not rise to the level of pervasive conduct"), *aff'd*, No. 24-1956, 2007 WL 10131754 (2d Cir. Feb. 6, 2025), and *Campbell v. N.Y.C. Transit Auth.*, 662 F. App'x 57, 60 (2d Cir. 2016) (affirming grant of summary judgment where plaintiff failed to demonstrated "a hostile work environment because [defendant's] alleged conduct was neither severe nor pervasive"), and *Ireland v. Rochester Inst. of Tech.*, No. 19-CV-6392, 2019 WL 5538371, at *5–6 (W.D.N.Y. Oct. 25, 2019) (dismissing complaint because allegations failed to demonstrate "sufficiently severe or pervasive" misconduct)).)

subsequently condoned it." *Castillo v. Isakov*, No. 22-CV-6888, 2023 WL 6664552, at *6 (S.D.N.Y. Oct. 12, 2023) (quoting *Father Belle Cmty. Ctr. v. N.Y. State Div. of Hum. Rts. Ex rel. King*, 642 N.Y.S.2d 739, 746 (App. Div. 1996)); *see also Marchuk v. Faruqi & Faruqi, LLP*, 100 F. Supp. 3d 302, 307 (S.D.N.Y. 2015) (noting that, under the NYSHRL, "an employer is never strictly liable for the conduct of employees, even if the harassing employee is [the] [p]laintiff's supervisor," but instead, "is only liable for conduct that it encouraged, condoned, or expressly or impliedly approved"). "Condonation . . . contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *Castillo*, 2023 WL 6664552, at *6 (quoting *State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp*., 487 N.E.2d 268, 269 (N.Y. 1985)); *see also M.H. v. Starbucks Coffee Co.*, No. 22-CV-10507, 2023 WL 5211023, at *5 (S.D.N.Y. Aug. 13, 2023) (same). "Alternatively, an employer's calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation." *Soto v. CDL (New York) L.L.C.*, No. 18-CV-5678, 2020 WL 2133370, at *14 (S.D.N.Y. May 5, 2020) (quoting *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 522 (E.D.N.Y. 2014)); *see also Castillo*, 2023 WL 6664552, at *6 (same).

Defendants assert that Dinsmore "do[es] not allege that Defendants were aware of this conduct" other than a single conclusory allegation that Plaintiffs "complained without any allegations setting forth when they complained, who they complained to, what they complained about, and what was done in response to the complaints." (*See* Defs' Mem. 13 (citing SAC ¶ 186).) Contrary to Defendants' assertions, however, Dinsmore alleges that she complained to Dana Collins on two specific occasions: first when a customer filmed up Dinsmore's skirt, (SAC ¶¶ 184–85), and second, in November 2024, when Dinsmore informed Collins both that the kitchen staff "inappropriately touched the female staff" and that a chef at Publick House had

shouted at Dinsmore "to give him oral sex," (*id.* ¶ 187). Dinsmore also alleges that, on both occasions, Collins refused to take any action and instead, threatened to discipline Dinsmore. (*See id.* ¶ 185 ("Collins did not do anything and instead reprimanded Dinsmore for complaining . . ."); *id.* ¶ 187 ("Collins stated that she would not do anything about the chef's behavior because it was not as easy to replace a chef as it was a bartender or server.")). These allegations of "calculated inaction" are sufficient to impute liability to Defendants under the NYSHRL. *See also Guzman v. Macy's Retail Holdings*, No. 09-CV-4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010) (finding that plaintiff pleaded facts "demonstrating that [her employer] condoned, encouraged, or approved of the discriminatory acts at issue" when she alleged she complained to the Human Resources Regional Vice President who "not only refused to investigate but threatened her with termination if she made further complaints"); *Melendez v. Int'l Serv. Sys., Inc.,* No. 97-CV-8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr. 6, 1999) (finding allegations that "[p]laintiff reported his discriminatory treatment . . . to numerous people up the chain of command in the management of [defendants], yet no remedial action was taken" were sufficient to "indicate condonation" (internal quotation marks omitted)); *cf. Burke v. Villa*, No. 19-CV-2957, 2021 WL 5591711, at *9 (E.D.N.Y. Nov. 30, 2021) (denying summary judgment where a jury could find that a lack of response to plaintiffs "direct complaint of 'continuous[] touching,'" as well as the "decision not to discipline [the harasser] could . . . be considered condonation"); *Prophete-Camille v. Stericycle, Inc.*, No. 14-CV-7268, 2017 WL 570769, at *10 (E.D.N.Y. Feb. 13, 2017) (finding, on summary judgment, that "[d]efendant's total inaction in response to

[p]laintiff's alleged complaints constitutes condonation such as to impute liability to [d]efendant for [the harasser's] conduct").[14]

Accordingly, Defendants' motion is denied as to Dinsmore's sexual harassment claim.

c. Aiding and Abetting Under the NYSHRL (Claim 10)

Next, Defendants argue that Dana and Kevin Collins cannot be held individually liable for aiding and abetting discriminatory conduct under the NYSHRL. (Defs' Mem. 16–17.)

"Under the NYSHRL, an individual can be liable '(1) if the defendant has an ownership interest in the employer or has the authority to hire and fire employees, and (2) if the defendant was aiding and abetting the unlawful discriminatory acts of others.'" *Viruet v. City of New York*, No. 16-CV-8327, 2019 WL 1979325, at *16 (S.D.N.Y. May 3, 2019) (quoting *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *34 (E.D.N.Y. Sept. 24, 2014) (quotation marks and citations omitted)); *see also Baptiste v. City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023) ("[Individual Defendants] can be held liable under the state statute only on an aider-and-abettor theory." (citing *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 457–59 (2021)). As a predicate to claiming aiding and abetting discrimination, a plaintiff must have pled discrimination by a principal. *See Xiang v. Eagle Enters., LLC*, No. 19-CV-1752, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020). Once a plaintiff has done so, to then "make out an aiding and abetting claim, the pleadings must allege that [defendant] actually participate[d] in the conduct giving rise to a discrimination claim." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 337 (S.D.N.Y. 2020) (internal quotation marks omitted); *see also Ulrich v. Soft*

[14] In support of this argument, Defendants point only to *Starbucks*. (Defs' Mem. 13.) In *Starbucks*, the court found that Starbucks had not condoned or encouraged the harassing behavior where plaintiff had also alleged "Starbucks took disciplinary action to address [the harasser's] behavior." 2023 WL 5211023, at *5. Here, in contrast, Defendants allegedly refused to take action after receiving complaints and thus, *Starbucks* is inapposite.

*Drink, Brewery Workers & Delivery Emps., Indus. Emps., Warehousemen, Helpers & Miscellaneous Workers, Greater New York & Vicinity, Loc. Union No. 812*, 425 F. Supp. 3d 234, 243 (S.D.N.Y. 2019) ("An individual defendant may be held liable under the aiding and abetting provision of the NYSHRL if he actually participates in the conduct giving rise to a discrimination claim." (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 n.10 (2d Cir. 2011)). "The aider and abettor must 'share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose.'" *Warren v. Ultimate Fitness Grp., LLC*, No. 19-CV-10315, 2021 WL 4239246, at *5 (S.D.N.Y. Sept. 17, 2021) (quoting *Fried v. LVI Servs., Inc.*, No. 10-CV-9308, 2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011)). However, individuals can be liable as an aider and abettor if they "failed in a supervisory capacity to take appropriate remedial or investigative measures." *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21-CV-2512, 2022 WL 524551, at *13 (S.D.N.Y. Feb. 22, 2022); *see also Parra v. City of White Plains*, 48 F. Supp.3d 542, 555 (S.D.N.Y. 2014) (noting that a "supervisor's failure to take adequate remedial measures in response to a complaint of discrimination has been deemed actual participation under [the NYSHRL]" (internal quotations omitted)).

Plaintiffs allege that the Individual Defendants both have "an ownership interest" in the restaurants. (*See* SAC ¶ 13 ("D. Collins is the owner and managing member of Roonies, Inc. and Tweegs."); *id.* ¶ 14 ("K. Collins is the part-owner and member of Roonies and Tweegs.").) Accordingly, they have adequately pled that the Individual Defendants aided and abetted the discrimination against Milanese and Dinsmore. *See Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521 (S.D.N.Y. 2015) ("The NYSHRL allows for individual liability . . . if the defendant has 'an ownership interest' in the employer . . . ." (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310

(2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998))).

Moreover, as discussed above, Plaintiffs have also alleged adequate facts to infer that Dana Collins was aware of Dinsmore's harassment and failed to take any remedial action. Accordingly, even apart from her ownership interest, Plaintiffs have plausibly alleged Dana Collins's aider-abettor liability. *See Brown v. County of Westchester*, No. 22-CV-6146, 2024 WL 21937, at *11 (S.D.N.Y. Jan. 2, 2024) ("Plaintiff has plausibly pled that [Defendant] . . . aided and abetted [the] harassment of Plaintiff by failing to take remedial measures against [the harasser.]"); *Al-Shimary v. State Univ. of N.Y. at Binghamton*, No. 22-CV-1282, 2023 WL 7128861, at *6 (N.D.N.Y. Oct. 30, 2023) (denying motion to dismiss aider and abettor claim where "[p]laintiff alleges that he informed [his supervisor] on at least two occasions of discrimination, yet she did nothing to address the problem"); *Parra*, 48 F.Supp.3d at 555 (concluding that allegations that a supervisor "rebuked [plaintiff] for complaining about [the] . . . harassment" was sufficient to state a NYSHRL aiding and abetting claim).

Accordingly, Defendants' Motion is denied as to Milanese and Dinsmore's aiding and abetting claims.[15]

3. Remaining Claims

Finally, although Defendants ostensibly seek dismissal of fourteen of Plaintiffs' claims, (*see* Defs' Mem. 5), Defendants do not substantively address Plaintiffs' claims under the NYLL

[15] Because Pullman has failed to state a discrimination claim, the Individual Defendants cannot be held liable for aiding and abetting any actions against her. *See DeJesus v. Bon Secours Cmty. Hosp.,* No. 23-CV-806, 2024 WL 554271, at *10 (S.D.N.Y. Feb. 12, 2024) (dismissing aiding and abetting claim "because plaintiff fails to allege an underlying violation of the NYSHRL" (citing *Boonmalert v. City of New York*, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order))), *reconsideration denied*, No. 23-CV-806, 2024 WL 1484253 (S.D.N.Y. Apr. 5, 2024).

for record keeping violations or for notice and wage statement violations (Claims Four and Seven). Similarly, Defendants present no arguments for dismissal of Plaintiffs' unjust enrichment claim (Claim Five) or Milanese and Dinmore's retaliation claims under the NYSHRL (Claim Twelve). Because Defendants do not offer any substantive explanations as to why these claims should be dismissed, Defendants' Motion is denied as to these claims. *See Garcia v. ROC Nation LLC*, No. 24-CV-7587, 2025 WL 1865965, at *15 (S.D.N.Y. July 2, 2025) ("[D]efendants offer no arguments [as to] why . . . the Court should dismiss [p]laintiff's NYLL claim for failure to provide accurate wage notices and wage statements. . . . Therefore, the Court declines to dismiss that claim."); *Hall v. Warren*, No. 21-CV-6296, 2022 WL 2356700, at *12 (W.D.N.Y. June 30, 2022) (declining "to manufacture additional arguments in favor of dismissal that [the] [d]efendants fail to raise themselves" and partially denying motion to dismiss); *Rubenstein v. Cosmos Holdings, Inc.*, No. 19-CV-6976, 2020 WL 3893347, at *12 (S.D.N.Y. July 10, 2020) (denying motion to dismiss and "declin[ing] to make arguments for dismissal that [d]efendants chose not to present"); *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 535 (E.D.N.Y. 2011) (declining to dismiss unjust enrichment claim where defendant did not raise any arguments supporting dismissal); *cf. Vasquez v. N.Y.C. Dep't of Educ.*, No. 11-CV-3674, 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015) ("Courts generally deem an argument waived or abandoned if a party fails to make it.").

## III. Conclusion

For the foregoing reasons, Defendants' Motion is denied in part and granted in part. Defendants' Motion is denied as to all Plaintiffs' FLSA and NYLL overtime claims (Claims One and Two), all Plaintiffs' NYLL unpaid wages claims (Claim Three), all Plaintiffs' NYLL recording keeping and notice and wage statement violation claims (Claims Four and Seven),

Pullman, Milanese, and Dinsmore's spread-of-wages claim (Claim Six), Milanese's gender discrimination claim (Claim Eight), Milanese and Dinsmore's aiding and abetting claims against the Individual Defendants (Claim Ten), and Dinsmore and Milanese's NYSHRL retaliation claims (Claim Twelve).

Defendants' Motion is granted as to Knanishu's spread-of-wages claim (Claim Six), Pullman's gender discrimination claim (Claim Nine), and Milanese's retaliations claims under the NYLL and the FLSA (Claims Eleven and Fifteen). The Court's dismissal of these Counts is without prejudice because this is the first adjudication of Plaintiffs' claims on the merits.

If Plaintiffs wish to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within thirty days of the date of this Opinion & Order. *See Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *19 (S.D.N.Y. Mar. 25, 2019) ("The Court will afford Plaintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, he still believes that he can plausibly state claims against Defendants." (alteration adopted) (citation omitted)). There will be no extensions. Plaintiffs are further advised that an amended complaint will completely replace, not supplement, the Second Amended Complaint. Any amended complaint must therefore contain *all* of the claims, defendants, and factual allegations that Plaintiffs wish the Court to consider. If Plaintiffs fail to timely file an amended complaint, the dismissed claims may be dismissed with prejudice.

The Court will hold a telephonic conference on November 12, 2025, at 2:30 PM.

The Clerk of the Court is respectfully directed to terminate the pending motion. (Dkt. No. 41.)

SO ORDERED.

DATED: September 18, 2025
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE